GALEN INSTITUTE, LLC ET AL.)    CASE NO. 3:02-CV~~~~~~~~~~~~)

v.                          )

VALERIE LEWIS ET AL.        )    APRIL 26, 2005

2005 APR 29 P 2: 50

U.S. DISTRICT COURT
BRIDGEPORT, CONN.

### AFFIDAVIT OF JAMES J. LATTANZIO, JR.

I, the undersigned deponent, being over the age of eighteen years and believing in the obligation of an oath, do hereby depose and state the following:

1.  It has always been my understanding that at any time when a DHE official enters a school or communicates to a school on official DHE stationery, it is under the aegis, authority or control, or as a designee of the commissioner, pursuant to the state statutes and regulations governing occupational schools.

2.  Galen Institute did in fact file a complete response to every issue raised by DHE; however in said DHE communications, DHE kept changing the "conditions" to which Galen purportedly had to respond, preventing Galen from being able to respond to previous requests.

3.  I have personal knowledge, based upon my extensive work with COMTA, and a review of applicable public records, that COMTA did not become nationally recognized as an accrediting agency by the U.S. Department of Education until July 17, 2002. Therefore, COMTA was not a "federally recognized" accrediting agency when it visited Galen on March 25 and 26, 2002.

1

4. On April 25, 2002 I forwarded a letter on behalf of Galen to the chairman of the Board of Governors, requesting that the Board require commissioner Lewis to recuse herself from making decisions regarding Galen because of what I perceived as a conflict of interest stemming from the tension then existing between DHE and Galen, and from Lewis personally knowing one L. Carole Woodbury, who once had been employed by, and been terminated from, Galen.

5. In a July 29, 2002 letter I sent to DHE, Galen addressed the issues in the corresponding DHE letters. However, within each DHE letter and subsequent letters was contained a new set of demands that was not previously disclosed to Galen within the May 5th probation letter, rendering it impossible to comply with the previous DHE letter.

6. What DHE requested in this October letter was again a new and different set of additional terms and conditions, not just a reiteration of previous ones, and a clear reading of exhibit I shows that it is a letter from Galen.

7. A clear reading of exhibit K shows that it is a letter from Galen, not DHE.

8. A clear reading of exhibit L shows that it a letter from Galen, not DHE.

9. A clear reading of exhibit L shows that it a letter from Galen, not DHE.

10. From January, 1999 to about July, 2000 William Pizzutto and Patricia Santoro were the designees of the commissioner who oversaw Galen Institute.  Pizzutto left the employment of DHE in mid 2000, and Santoro remained to oversee Galen.

11. In 1998 Galen Institute began the planning process to gain accreditation, which is an extremely complicated process, and can take from three to five years, or more, to complete.

12. Accreditation is accomplished in steps.  One criterion prior to making formal application to begin the accreditation process is that a school must be operational, or have taught the program seeking accreditation, for at least twenty-four continuous months prior to beginning the application for accreditation.

13. Pursuant to C.G.S. section 20-206b, Galen Institute was on a very precise time line schedule, which could not be interrupted, in order to become accredited by April 1, 2002, and thus comply with said law.

14. Beginning in 1998 and each of the following years, 1999 and 2000, William Pizzutto and Patricia Santoro, designees of the commissioner Valerie Lewis, conducted onsite evaluation inspections of Galen Institute.

15. For each of the years 1998, 1999 and 2000 Galen Institute was authorized and then re-authorized by the DHE, and therefore all statutory requirements must have been met.

3

16. During all years, but specifically the years 1998, 1999 and 2000, any revisions we made to Galen's operations were required to be submitted to the DHE, and those revisions must, according to applicable statute, be denied or approved by DHE. If approved, the revisions then become part of Galen's legal and approved authorization.

17. In or about July, 2000 Brenda Lerner was assigned by DHE commissioner Lewis as designee and begun to oversee Galen Institute operations and authorization.

18. In or about July, 2000, Galen Institute filed its renewal application to DHE for re-authorization for the upcoming year 2001, which application incorporated the previous years' DHE approvals and authorizations.

19. In or about February, 2001 Brenda Lerner and Patricia Santoro, as designees of commissioner Lewis, conducted a scheduled re-authorization inspection at Galen Institute, Wethersfield, which inspection included a curriculum evaluation by a DHE appointed specialist, Valerie Voner.

20. At the conclusion of said February, 2001 inspection, Lerner and Santoro met with me in my office at Galen Institute.

21. At said meeting, although Patricia Santoro was purportedly Galen's DHE project officer, Brenda Lerner did most of the talking, and informed me by reciting from her own notes that many problems existed concerning the operations of Galen.

4

She stated that Galen was not in compliance with the law, and asserted that all of the student records and files were "not being kept properly."

22. At said meeting, Brenda Lerner informed me that the school's catalog and enrollment content were not in compliance with the law.

23. At said meeting, Brenda Lerner informed me that the school's grading system was not in compliance with the law.

24. At said meeting, Brenda Lerner informed me that the school's filing system, grading system, catalog, admission policies and enrollment contract would have to be changed prior to re-authorization.

25. Each of the aforesaid items on Brenda Lerner's list was the same item(s) that had been submitted to DHE, William Pizzutto and Patricia Santoro for all previous years, and approved by DHE as being in full compliance with state law.

26. Subsequent to the 2001 inspection and meeting with me, DHE then provided Galen Institute with a written "report," signed by Patricia Santoro as Galen project officer, that required Galen to make substantial and costly changes at the school prior to re-authorization.

27. This affiant has personal knowledge that there are no statutory requirements for any private occupational school to have a numerical grading system, and there are many such schools

5

in Connecticut that do not have such, all knowingly allowed by DHE.

28. There are no statutory requirements for any private occupational school to keep student files in any specific manner such as those forced upon Galen Institute.

29. Subsequent to Galen Institute making these numerous and costly changes imposed on it, a May 18, 2001 DHE letter report acknowledged that Galen Institute was being authorized only for one year, in part due to verbal telephonic complaints, to the DHE, accusing Sandra J. Lattanzio and me of having been "abusive, threatening and intimidating to students."

30. I, James J. Lattanzio, Jr., for myself and having personal knowledge of Sandra J. Lattanzio, have never threatened or intimidated anyone, let alone students at my own school.

31. Subsequent to said DHE February, 2001 inspection, Galen Institute, under the threat of revocation, effected all the required changes, and DHE re-authorized Galen Institute for an additional one year period consisting of February, 2001 through February, 2002.

32. In or about May, 2001, Donna Pitts, Galen's school director, and I traveled to DHE in West Hartford because we were required to "turn over," as a result of a "phone complaint," a complete copy of Galen's curricula, outlines, tests and quizzes, and a full set of actual text books used in the programs.  We

6

met with Brenda Lerner and Patricia Santoro, and at said meeting I specifically questioned each required change, and also stated that each requirement placed on Galen was not required by law.

33. At said meeting Brenda Lerner stated to Donna Pitts and me that "all" schools are required to have a numerical grading system.

34. At said meeting Brenda Lerner stated to Donna Pitts and me that "all" schools are required to have an "objective admission policy."

35. At said meeting I showed Brenda Lerner at the DHE offices that the only other massage training school in Connecticut, the Connecticut Center For Massage Therapy (hereinafter "CCMT"), did not have such policies, evidenced by a past and current year catalog from such school, and several copies of two years' worth of CCMT's grading sheets.

36. I have personal knowledge, based on admissions from Brenda Lerner, that she was at all times relevant to this complaint the DHE project officer for CCMT.

37. At said meeting I showed Brenda Lerner that CCMT had very subjective admissions policies evidenced by past and current year catalogs from such school, on page 14.

38. At said meeting I showed Brenda Lerner that CCMT had a simple Satisfactory/Unsatisfactory grading system, not one of numerical grading, which I established by showing her a past and

7

current year catalog from such school, and supplied Lerner with copies of grade reports from CCMT that clearly showed only a Satisfactory/Unsatisfactory grading criterion was used.

39. I then proffered to Lerner a CCMT catalog and actual student transcript that clearly showed that CCMT used a Satisfactory/Unsatisfactory grading system, and also had a highly subjective admissions policy.

40. At said meeting, and after I pointed out the disparate treatment administered to my school and to CCMT, Lerner refused to look at CCMT material and stated, "I'm not going to debate these issues," and concluded the meeting.

41. In or about February and March, 2002 Brenda Lerner and Patricia Santoro, as designees of commissioner Lewis, conducted another scheduled re-authorization inspection at Galen Institute, which inspection(s) included a curriculum evaluation by a DHE appointed specialist, Valerie Voner.

42. At the conclusion of said February and March, 2002 inspections, Lerner and Santoro met with me at the Galen Wethersfield facility, and with Sandra Lattanzio and me at the Galen Stamford facility. Although Patricia Santoro was apparently Galen's DHE project officer, Brenda Lerner did most of the talking, and informed me, by reciting from her notes, that again Galen was not in compliance with the law. She told me that Galen failed to comply regarding, in part, the student

records, school catalog, grading system, enrollment contract and school policies.

43. The Galen school catalog, enrollment contract, school policies and, in part, the student records were the same documents that DHE had approved and that Brenda Lerner and Patricia Santoro had in part reviewed, and then approved, in April-May, 2001.

44. Subsequent to the 2002 inspection and meeting with DHE, DHE then provided Galen Institute with a written "report," signed by Patricia Santoro, that required Galen to again make substantial and costly changes at the school and prior to re-authorization.

45. Subsequent to said DHE February, 2002 inspections, Galen Institute, under the threat of revocation, effected all the required changes, in the very same manner as it did in previous years, and informed DHE in writing of said changes. I pointed out to DHE in 2001 that Galen's competitor school, CCMT, was not required to adopt these grade, admission and catalog requirements, that even a year later, CCMT was not required to adopt the initial 2001 changes nor the new 2002 ones.

46. On March 25, 2002 at 9:00 a.m. I observed Brenda Lerner and Timothy Tynan from the DHE appear unannounced at the Galen Institute facilities in Wethersfield.

47. On March 25, 2002 Galen Institute was undergoing its accreditation inspection.  Galen had been proceeding with its ongoing and now 2½ year accreditation process with a non-federally recognized agency known as the Commission on Massage Therapy Accreditation (hereinafter "COMTA"), a private accrediting business, in which process I was involved.

48. A site visit for March 25 and 26, 2002 had been scheduled with COMTA to further Galen's accreditation efforts, which site visit I attended.

49. At the time, COMTA was not a federally recognized accrediting agency, and therefore DHE could not accept its accreditation in lieu of DHE re-authorization, pursuant to Connecticut law.  Because of my personal involvement in the COMTA accreditation process, I have personal knowledge of COMTA's federal recognition status at the time of the inspection.

50. Pursuant to the state statutes and regulations, with all of which I am familiar as the member of Galen, and to the best of my knowledge, DHE has no obligation to observe, nor has it ever observed, any accreditation visit by a private accreditation agency at an occupational school.  Subsequent to

this COMTA/DHE visit, Galen went through another accreditation visit by another private agency in July, 2002, which onsite visit DHE did not attend.

51. Upon entering the school on March 25, 2002, Brenda Lerner, while standing in the hallway in the school, requested me to have all student files brought into the room reserved and occupied by COMTA.

52. According to the onsite visit policy, which Galen complied with, the COMTA team of four evaluators was to work in isolation from the school personnel in a room designated for their exclusive use.

53. I personally had several opportunities to enter the room, in which instances I observed Brenda Lerner and Timothy Tynan sitting at the large table in the center of the room with the four COMTA evaluators, looking through, with the COMTA evaluators, the accordion folders that contained, by classes, the student records.  In a subsequent court trial disclosure statement involving COMTA, in which action I am a party, COMTA admitted to possessing copies of student files, attendance and grade reports.

54. COMTA accreditation policies, of which I am familiar as member of Galen Institute and a participant in the accreditation process, did not require us to disclose all of the materials that Brenda Lerner had requested of us.  Some of these extra

materials included confidential student medical, financial and credit records and materials.

55. On March 25, 2002 there were four COMTA evaluators present, and six full meals ordered from a local restaurant for which Galen paid.  When I periodically entered the room, I observed Brenda Lerner and Tim Tynan each eating a meal, to which they were not entitled, nor was it offered to them by Galen.

56. In reading the reports from DHE regarding the March, 2002 visit, the DHE May 5, 2002 probation letter and the exhibits supplied with defendants' motion to dismiss, it appears that specific statements within the DHE information mirror almost exactly the COMTA onsite report, thus making same appear to be more than a simple coincidence.

57. On March 25, 2002, when I had the opportunity to enter the COMTA reserved room during the site visit, I personally observed Brenda Lerner and Timothy Tynan discussing information, exchanging files and actively participating in the accreditation visit, which I was not informed by DHE or COMTA that DHE would be present at all.

58. As I was personally involved in the COMTA accreditation process, I have knowledge that COMTA does not need and does not require much of the information that Lerner and Tynan shared

12

with the COMTA evaluators, including students' medical,

financial and credit materials, and some personal information.

59. Brenda Lerner's position at the DHE required her by law

to review and then approve each year the financials of Galen in

order for Galen to continue to be authorized; however, the COMTA

team that was supplied the letters written by Brenda Lerner

approving Galen's financials reported that they, COMTA, could

not verify Galen's financials, even though Brenda Lerner was

present with COMTA the entire day of March 25.

60. COMTA reported to Galen that in "not one" of the

graduate student files that it examined did any student have

even 500 hours of attendance.

61. Galen terminated its accreditation attempt with COMTA

in May, 2002.

62. COMTA denied Galen accreditation on or about April 1,

2003.

63. From the first day Galen opened, and in order to

successfully compete in our market, our goal was to become

accredited, which goal was a very expensive and lengthy process,

which was then irrevocably destroyed by the acts of DHE,

including massive financial losses and the collapsing of our

growth.

64. On April 5, 2002 I received a phone call from Galen

staff reporting that Brenda Lerner and Patricia Santoro entered

13

Galen Institute without warning, and informed the school director, Donna Pitts, that Galen was officially being placed on "probation."  I then questioned via telephone directly Patricia Santoro, who replied, "we did this because the re-authorization extension dates had expired," which ultimately was not the truth.

65.  Galen was issued two certificates bearing in bold type the term "PROBATIONARY."  Brenda Lerner instructed me that these certificates had to be placed in public view, in the lobby, at each Galen school and branch campus.

66.  I have knowledge that Brenda Lerner and Patricia Santoro, while at the Galen Wethersfield facilities on May 5, 2002, copying student files and records on the Galen copy machine, using a ream of paper they had brought with them.

67.  Under the rules of federal recognition, CFR Title 34, section 602, of which I am familiar by virtue of my direct and active participation in the accreditation process, and as a result of my knowledge of the COMTA accreditation policies, a school that has been placed on probation by any state agency cannot be granted accreditation, unless the accrediting agency finds there exists "overwhelming and mitigating" circumstances to justify accredition.

68. In numerous communications to DHE, Galen Institute explained why said DHE assessment and probation was legally in error and must be corrected.

69. Galen Institute received no reply from DHE concerning Galen's requests, Galen's approved policies and previous authorizations.

70. DHE had approved the 600-hour program in March, 1999, 2000 and then in 2001.

71. For three years DHE had continued to approve the Galen 600 hour program.

72. In 2000, when Brenda Lerner was assigned in part as overseer of Galen Institute, she stated to me that "almost everything" was "not in compliance" with law.

73. Not only had DHE approved these clock hour and attendance policies of Galen Institute, but these policies were also the federally approved and educational industry standard fifty-minute clock hour and ninety percent attendance graduating policy of which DHE must have had full knowledge.

74. For the simplicity of tracking, Galen Institute conducted its program and recorded attendance by "wall clock hour."

75. The "wall clock hour" would then need to be converted to the approved "50 minute credit clock hour."

15

76. DHE approved said method of using 50 minute clock credit hours in 1999.

77. DHE then failed to convert the wall clock hour from the raw attendance sheet to actual clock credit hours.

78. DHE also approved the Galen Institute completion policy in 1999, which policy was modeled after the federal policy of "90% of attendance must be completed" in order to successfully graduate.

79. DHE failed to apply the "90% completion policy" that DHE had previously approved, which failure was one of the reasons DHE alleged for placing Galen on probation. This approved policy translated to a minimum attendance of 540 hours needed to complete a 600 hour program, which 540 hour policy DHE has admitted is what student files revealed.

80. DHE then failed to review the documents filed with the Department of Public Health, even after I pointed out to DHE that the problem lies with the form and not Galen. DHE failed to review the forms filed by Galen's competitor school, CCMT, which also had a 600 hour program, which documents filed by CCMT all indicated in part that CCMT students completed a "600 hour program."

81. DHE selectively singled out Galen Institute and applied to it, and then kept changing, "criteria and requirements" that it did not apply to other schools like CCMT, while representing

16

that it was the "law." DHE ignored all the facts surrounding these problem issues that Galen continued to point out to them.

82. In an April, 2002 meeting with Jan Cordova and Debbie Brown, Massage Licensing supervisors from the Department of Public Health, I communicated to them this situation, and confirmed that CCMT filed the same documents listing "600" hours for each form filed.

83. For all the years Galen had been graduating its students, 98% of those students that have taken the National Certification Exam required by Connecticut have passed the exam and have been licensed by the State, and not once has the Department Of Public Health questioned Galen for its practices.

84. Although Galen Institute communicated via a series of correspondence to DHE regarding the aforesaid matters, DHE all but ignored same, and failed to hold CCMT to the same standard.

85. In December, 2002 DHE officers Patricia Santoro and Yohang Rong inspected Galen Institute and officially reported all records, files, policies, catalogs, contracts and school policies to be in full compliance with laws and recommended non-probationary authorization.

86. That December inspection and recommendations were based mostly, and in part, on the very same records that Brenda Lerner and the DHE had previously reviewed and ultimately rejected in February, March and April, 2002.

87. In May, 2002, when Galen was forced to place the probationary certificate in a public place, our enrollments began to steadily decline, which also caused Galen to financially suffer, and when the probation was removed in December, 2002 our enrollments began to pick up.

88. All of the aforesaid selective acts that were enforced on only Galen by Brenda Lerner, Valerie Lewis and Jonas Zadanys and DHE have destroyed Galen's ability to compete in the Connecticut massage therapy education market, and forced Galen to raise its tuition to cover losses, which reduced the number of enrollments and services Galen could provide.

89. Galen Institute attributes the aforesaid acts, in part, to the fact that Valerie Lewis was a personal friend of L. Carole Woodbury, who mentored Lewis's daughter, who also worked for and had a falling out at Galen Institute.

90. In February, 2003, Galen was inspected again by DHE and subsequently issued a three year re-authorization until 2006.

91. All of these aforementioned acts of Lewis, Zdanys and Lerner have caused me much psychological and emotional distress, including the mental stress and agony of having to try to resuscitate the business which I created. I have observed numerous times during the past three years the effects of same on my spouse, Sandra J. Lattanzio. I have observed her many times suffering from the same stress and agony caused by these

problems.   Sandra J. Lattanzio is director of admissions of

Galen Institute, and she is cognizant of all of these problems

recited in this affidavit.


_____
James J. Lattanzio Jr.



Subscribed and sworn to before me this 27th day of April, 2005.


_____
Thomas A. Amato
Commissioner of the Superior Court