**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

GALEN INSTITUTE, LLC, ET AL,      )      CIVIL ACTION NO.
    *Plaintiffs*              )      3:02 CV-1637(JCH)
                            )
    v.                    )
                            )
VALERIE LEWIS, ET AL          )
    *Defendants*           )      MAY 19, 2005

**REVISED MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

       The defendants in above action respectfully submit this memorandum in support of their accompanying motion for summary judgment.

**I.**      **Statement of Facts and Nature of Proceedings**

       The Galen Institute ("Galen"), a private occupational school in Connecticut, received its initial one year authorization from the State of Connecticut, Department of Higher Education ("DHE") to operate a program training clinical therapeutic aides on or about February 5, 1998. (Aff. of V. Lewis ¶¶ 3-5, Attachment 10, p. 1.)  DHE is empowered by state law to oversee and regulate the operation of private occupational schools pursuant to Conn. Gen. Stat. §§ 10a-22a through 10a-22x and regulations promulgated thereunder (and their statutory and regulatory predecessors). A year later, Galen received a one year renewal of its authorization.

       On or about February 5, 2000 and February 5, 2001, DHE renewed Galen's authorization for the three message therapy training programs for additional respective one year periods. (Aff. of V. Lewis, ¶¶ 4-8, Ex. C, Attachment 15, pp. 13-17.)  On May 2, 2001, an extension of time was granted to Galen for filing the school's annual reviewed or audited financial statements for the period ending December 2000.  (Aff. of V. Lewis, ¶ 7, Ex. A, Attachment 10, p. 9.)  In addition, during this period Galen added a branch campus in Stamford and received authorization

for the additional training programs on May 18, 2001. (Aff. of V. Lewis, ¶ 8, Ex. C, Attachment 10, pp. 16-17.)

On or about February 19, 2002, a DHE evaluation team conducted a site visit to Galen's Wethersfield location. (Aff. of P. Santoro, ¶ 20, Ex. I, Attachment 12, pp. 42-56; Aff. of B. Lerner, ¶ 19, Ex. H, Attachment 9, pp. 43-53; Aff. of J. Zdanys, ¶ 14, Attachment 15, p. 2.) On March 1, 2002, DHE sent a letter to Galen outlining evaluation visit findings that the school needed to respond to. (Aff. of P. Santoro, ¶ 21, Ex. J, Attachment 12, pp. 57-63; Aff. of J. Zdanys, ¶ 16, Ex. C, Attachment 15, pp.19-23.) A further site visit was conducted at Galen's Stamford branch on March 19, 2002. (Aff. of P. Santoro, ¶ 23, Ex. K, Attachment 12, pp. 64-71; Aff. of B. Lerner, ¶ 21, Ex. I, Attachment 9, pp. 54-63.) On or about March 20, 2002, Galen sent a letter to DHE purporting to respond to the evaluative findings. (Aff. of P. Santoro, ¶ 25, Ex. L, Attachment 12, pp. 72-73.) On April 3, 2002, DHE sent a letter to Galen requesting documentation still missing from the February 19, 2002, evaluation visit. (Aff. of P. Santoro, ¶ 26, Ex. M, Attachment 12, pp. 74-80)

On or about March 25, 2002, the Commission on Massage Therapy Association ("COMTA"), a national accrediting organization recognized by the United States Department of Education, conducted an evaluation visit at Galen in connection with Galen's effort to attain national accreditation. (Aff. of P. Santoro, ¶ 27, Ex. N, Attachment 12, p. 81; Aff. of T. Tynan, ¶ 4, Attachment 13, p. 1.) Two DHE staff members, Thomas Tynan, Associate Director of Veterans Program Approval at DHE and Brenda Lerner were present as observers. (Aff. of T. Tynan, ¶¶ 14 & 15, Attachment 13, p. 2; Aff. of B. Lerner, ¶ 24, Attachment 9, p. 3.) At this visit, the DHE team reviewed sixty-three (63) student files of Galen students to ensure that a copy of an enrollment agreement (contract) indicating that 600 hours are needed for completion

of the program, a copy of the school's letter to the Department of Public Health certifying that students completed the 600 hours of instruction, and the students' attendance sheets and grade reports. (Aff. of T. Tynan, ¶¶ 7 & 8, Ex. A, Attachment 13, pp. 1, 5-6; Aff. of B. Lerner, ¶ 25, Ex. J, Attachment 9, pp. 64-67.)    Mr. Tynan personally conducted records reviews of twenty-nine (29) student files making notations on each file he reviewed.  Of the twenty-nine (29) files that he reviewed, only twenty-five (25) files contained attendance records. (Aff. of T. Tynan, ¶¶ 9-10, Ex. B, Attachment 13, pp. 7-8.)    Upon his return to DHE, Mr. Tynan made calculations based on his notations that demonstrated that the average number of hours for the program was four hundred twenty point five (420.5) hours and adding in the forty-five hours of internship hours yielded a total of four hundred sixty-five point five (465.5) hours.  (*Id*.)   To the best of Mr. Tynan's recollection and belief, the student files were not shared with the individuals from the accreditation site team.  (Aff. of T. Tynan, ¶ 13, Attachment 13, p. 2.)    Ultimately, Galen did not receive accreditation from COMTA.  (Aff. of P. Santoro, ¶ 49, Ex. Z, Attachment 12, pp. 315-321.)

On or about April 5, 2002, as a result of an on-site evaluations, DHE issued Galen a Certificate of Authorization (Probationary) for a period of ninety (90) days for Galen in Wethersfield and Galen in Stamford.  (Aff. of V. Lewis, ¶ 9, Ex. D, Attachment 10, pp. 18-19; Aff. of J. Zdanys, ¶ 19, Ex. D, Attachment 15, pp. 26-31.)   Accompanying this Certificate was an additional addendum letter outlining the reasons for the action, noting that student records were incomplete and that DHE could not verify that students had received the number of hours of instruction called for and contracted for in enrollment agreements and the school catalog, and required by the State Department of Public Health for massage therapist licensure.  (Aff. of J. Zdanys, ¶ 19, Ex. D, Attachment 15, p. 26.)    Galen was provided sixty (60) days to

3

demonstrate that it was in, or had come into compliance.    (Aff. of J. Zdanys, ¶ 19, Ex. D, Attachment 15, p. 26.)   Attached to the Commissioner's letter was the list of "Conditions of Authorization and Program Approval".  (Aff. of J. Zdanys, ¶ 19, Ex. D, Attachment 15, p. 28.) On April 25, 2002, Mr. Lattanzio made a formal complaint to the Chairman of the Board of Governors of Higher Education regarding Commissioner Lewis's purported relationship with LLC member, Carole Woodbury from the Stamford branch campus.  (Aff. of V. Lewis, ¶ 10, Ex. E, Attachment 10, pp. 20-23.)    The allegations in Mr. Lattanzio's were not factually accurate.  (*Id.*)

On June 5, 2002, Mr. Lattanzio responded to DHE's concerns indicating that Galen had met all conditions for authorization.  (Aff. of J. Zdanys, ¶ 20, Ex. E, Attachment 15, pp. 32-46.) A second Certificate of Authorization (Probationary) for Galen and the Stamford branch campus was issued on June 25, 2002, as a result of remaining deficiencies.  (Aff. of V. Lewis, ¶ 11, Ex. F, Attachment 10, pp. 25-27; Aff. of J. Zdanys, ¶ 21, Ex. F, Attachment 15, pp. 48.)   This probationary status was from July 4, 2002 until February 4, 2003.  (*Id.*)  In addition to the Certificate of Authorization, Dr. Zdanys wrote that Galen needed to send in documentation of evidence along with the school's June 5, 2002 explanation.   DHE requested information regarding a plan of corrective action.  (Aff. of J. Zdanys, ¶ 21, Ex. F, Attachment 15, p. 48.) Between July and August of 2002, Commissioner Lewis responded to two formal complaints that James Lattanzio made to the Chairman of the Board of Governors of Higher Education and the Governors Office of Constituent Services, stating that the basis for the formal complaints were based on inaccurate and/or false information.  (Aff. of Valerie Lewis, ¶¶ 10 & 12, Ex. E, G, Attachment 10, pp. 20-23, 30-33.)

On July 29, 2002, Mr. Lattanzio responded to DHE's letter of June 25, 2002, stating that Galen's plan of action would be to orient the DHE's evaluators and guide the Commissioner or her designee during the next on-site visit. (Aff. of J. Zdanys, ¶ 22, Ex. G, Attachment 15, p. 49.) On August 22, 2002, DHE wrote to Galen indicating that the July 29, 2002, letter failed to address the deficiencies previously noted and what was needed to bring Galen into compliance. (Aff. of J. Zdanys, ¶ 23, Ex. H, Attachment 15, pp. 50-51.) Again on October 15, 2002, DHE sent a similar letter of request as the August 22, 2002, letter. (Aff. of J. Zdanys, ¶ 24, Ex. I, Attachment 15, p. 52.)

On November 1, 2002, DHE received a letter from Galen dated October 31, 2002, addressing the student record keeping and attendance issues, including documents, some of which were revised on March 27, 2002, March 28, 2002 and May 2002. (Aff. of J. Zdanys, ¶ 25, Ex. J, Attachment 15, pp. 53-54.) On November 1, 2002, DHE notified Galen that based upon the October 31, 2002 documentation, the Department would like to set up a site visit. (Aff. of J. Zdanys, ¶ 26, Ex. L, Attachment 15, pp. 67-68.)

On November 7, 2002, Mr. Tynan received correspondence from James Lattanzio regarding possible approval of Galen for veterans' benefits. On November 12, 2002, Mr. Tynan responded to Mr. Lattanzio's letter outlining the procedure for approval of veterans' benefits at his school. Mr. Tynan did not receive a response to his November 12, 2002 letter. (Aff. of T. Tynan, ¶¶ 15 & 16, Ex. C, Attachment 13, pp. 9-10.)

Thereafter, several further written communications occurred between DHE and Galen on the issue of Certification and a scheduled visit took place on December 5, 2002. (Aff. of J. Zdanys, ¶¶ 26-27, Ex. K & L, Attachment 15, pp. 55-66, 67-68; Aff. P. Santoro, ¶ 43, Ex. X, Attachment 12, pp.302-313; Aff. of Y. Rong, ¶ 4, Attachment 11, p. 1.)

5

On or about December 11, 2002, DHE wrote to Galen that as a result of an on site evaluation a Certificate of Authorization lifting the probationary status prior to the February 4, 2003 expiration date had been issued. (Aff. of V. Lewis, ¶ 13, Ex. H, Attachment 10, pp. 34-38; Aff. of J. Zdanys, ¶ 28, Ex. L, Attachment 15, p. 67.)

On or about January 16, 2003, DHE granted Galen a sixty (60) day extension of its authorization in order to allow completion of the renewal evaluation. (Aff. of V. Lewis, ¶ 13, Ex. I, Attachment 10, pp. 38-52.)   Authorization without probation was issued up to February 3, 2003. (Aff. of V. Lewis, ¶ 13, Ex. I, Attachment 10, pp. 39-40.)

On January 28, 2003 Yuhang Rong, Associate Director of Academic Affairs at DHE was appointed by Patricia Santoro to be a Team Member for the purposes of conducting an evaluation site visit of Galen in Wethersfield. (Aff. of Y. Rong, ¶ 4, Ex. B, Attachment 11, pp. 5-8.)   Mr. Rong conducted an independent evaluation at Galen in Wethersfield on February 6, 2003. (Aff. of Y. Rong, ¶ 5, Ex. C, Attachment 11, pp. 9-16.)   On February 10, 2003, Mr. Rong completed his evaluation by recommending that Galen be authorized for a period of three years. (*Id.*)   A Certificate of Authorization was issued to Galen and its branch campus in Stamford on March 5, 2003. This Certificate was effective from February 5, 2003 and remains in place today until February 4, 2006. (Aff. of V. Lewis, ¶ 15, Ex. J, Attachment 10, pp. 41-45.)

In the operative complaint ("Amended Complaint"), the plaintiffs, Galen, its owner James Lattanzio, and his wife Sandra Lattanzio, purport to allege federal equal protection claims (Amended Complaint, Counts 1, 2 & 3), federal substantive due process claims (Amended Complaint, Counts 4, 5 & 6), a conspiracy claim under 42 U.S.C. § 1985 (Amended Complaint, Count 10) and numerous state law claims (Amended Complaint, Counts 7, 8, 9, 11, 12, 13, 14,

15, 16, 17, 18, 19 & 20) against the Commissioner of the DHE (Valerie Lewis), an Associate

Commissioner of the DHE (Jonas Zdanys) and a former DHE employee (Brenda Lerner). [1]

As more fully set forth below, each of these claims fails as a matter of law, and the

defendants should be granted summary judgment on all the claims.


## II.    The Standard of Review

Summary judgment should be granted when there are no genuine issues of material fact

and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477

U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The burden is on the moving party to

demonstrate the absence of any material facts in dispute.  American International Group, Inc. v.

London American International Corp., 664 F.2d 348, 351(2d Cir. 1981).  In determining whether

factual disputes exist, the court should resolve all ambiguities and draw all reasonable inferences

against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986).  Nonetheless, summary judgment serves the important and salutary

purpose of "avoiding protracted, expensive and harassing trials," and "[t]he summary judgment

rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate

as a talisman to defeat an otherwise valid motion."  Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.

1985) *cert. denied*, 474 U.S. 829 (1985).

---

[1] Notwithstanding the wording of the Amended Complaint, plaintiff Sandra Lattanzio has
indicated she is not asserting any civil rights violations, going so far as to state that only Galen
(and thus not Mr. Lattanzio) is pressing such claims. (*Plaintiff Sandra Lattanzio Answer To
Defendants' First Set of Interrogatories And Request For Production*, 4/25/03, p. 3,
Attachment 16, p. 2.)

III.    **Discussion**

    A.    **Plaintiff's Equal Protection Claims (Counts 1, 2 & 3) Fail Because Plaintiffs Can Establish Neither Selective Treatment, Nor That The Defendants' Actions Were Based On Any Impermissible Consideration Such As Race, Religion, Intent To Inhibit Or Punish The Exercise Of Constitutional Rights, Or Malicious Intent To Injure**

The applicable law provides that:

> A selective-enforcement claim based on the Equal Protection Clause must allege that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir.1999) (quoting LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)) (internal quotation marks omitted).

Giordano v. City of New York, et al, 274 F.3d 740, 750-751 (2d Cir. 2001). *Accord*, Harlen Associates. v. Village of Mineola, 273 F. 3d 494, 499 (2d Cir. 2001); Diesel et al v. Town of Lewisboro, et al, 232 F.3d 92, 103 (2d Cir. 2000). *See e.g.*, LeClair v. Saunders, 627 F.2d 606, 609-610 (2d Cir. 1980) (plaintiff's cannot establish selective enforcement of  water standards). The law further provides that to be successful in an equal protection claim brought by a purported "class of one," wherein the plaintiff alleges differential treatment compared to others similarly situated, plaintiff must establish there is no rational basis for the difference in treatment.  Village of Willowbrook et al, v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

    The facts establish that not only were the plaintiffs not subjected to selective treatment, there is absolutely no evidence that race, religion, intent to punish the exercise of constitutional

right or other malicious intent motivated any of the defendants' action. As described by Commissioner Lewis, other private occupation schools have been placed on probation by DHE, and one such school subsequently had its license revoked. (Lewis Deposition (hereinafter "Depo"), p. 63, Attachment 4, p. 17; Zdanys Depo, p. 247, Attachment 6, p. 62; *see also*, Aff. of V. Lewis, ¶ 16, Ex. K, Attachment 10, pp. 46-171.)   When it was brought to DHE's attention that another school had opened a branch campus without authorization, DHE acted upon the information and the school was required to come into compliance. (Lewis Depo, pp. 260-261, Attachment 4, pp. 41-42; Zdanys Depo,  pp. 277-278, Attachment 6, pp. 66-67.)   Nor has Galen been the only private occupational school required by law to post the document noting its probation. (Zdanys Depo, pp. 191-192, Attachment 6, pp. 53-54.)   Under this regulatory scheme each year DHE sends out many cease and desist or other enforcement type letters. (Lerner Depo, p. 119, Attachment 3, p. 16.)   If complaints come in to DHE they are investigated, no matter what school it is, and DHE has a number of standard letters it sends out, depending on the nature of the violations or concerns.  (Lerner Depo, pp. 122, 128, Attachment 3, pp. 17, 19; Aff. of P. Santoro, ¶ 38, Ex. S, Attachment 12, pp. 137-140.)   If DHE were to receive information indicating that another massage therapy school or private occupational schools was not following its advertised curriculum, DHE would investigate. (Zdanys Depo, p. 115, Attachment 6, p. 21.) [2]

   In terms of addressing concerns raised as a result of DHE site visits, Galen was again treated like any other school.  (Aff. of J. Zdanys, ¶ 29, Attachment 15, p. 4; Aff. of P. Santoro,

---

[2]   One of plaintiffs' assertions is that DHE staff improperly accompanied evaluators from a private, federally approved accrediting organization, the Commission on Massage Therapy Association ("COMTA") during a site visit in connection with Galen's effort to attain accreditation.  However, DHE personnel routinely accompanied such accreditation evaluators as observers and to serve as potential resources.  (Lerner Depo, pp. 62, 73, 102, Attachment 3, pp. 8, 13, 15; Aff. of B. Lerner, ¶¶ 24, 26, Attachment 9, pp. 3, 4; Lewis Depo, pp. 71, 75, Attachment 4, pp. 18, 22; Aff. of T. Tynan, ¶¶ 14, 15, Attachment 13, p. 2.)

¶ 52, Attachment 12, p.7; Aff. of B. Lerner, ¶ 30, Attachment 9, p. 4)   Other schools, like Galen, have been required to address such concerns, and receive similar information about what may be needed to attain full reauthorization, and their evaluation reports reflect similar input from DHE. (Zdanys Depo, pp. 73, 117, 224, 236, Attachment 6, pp. 13, 23, 57, 59.)   DHE seeks to ensure the same level of expectations is met for compliance at all schools.   (Lewis Depo, p. 148, Attachment 4, p. 29; Zdanys Depo, pp. 73, 79-80, 158, 215, Attachment 6, pp. 13, 15-16, 51, 56); (*see also*, *infra* at pp. 18-19).

Similarly, plaintiffs cannot demonstrate any improper motive on the part of the defendants, let alone one based on race, religion, punishment for the exercise of constitutional rights or malicious intent to injure.   Indeed, once it was determined that Galen had resolved the issues of concern that had prompted the reauthorization for a more limited period with probation, the Commissioner happily signed a letter of regular reauthorization. (Lewis Depo, pp. 34, 61, Attachment 4, pp. 4, 16.)   With respect to plaintiffs' repeated assertion that another massage therapy school received different treatment, several witnesses noted that under state law DHE is required to accept and rely upon an accreditation finding, which had not been obtained by Galen, so long as it was from an accrediting entity recognized by the U.S. Department of Education, unless DHE has just cause for refusing to do so. (Zdanys Depo, pp. 214-215, 224, 246, Attachment 6, pp.55-56, 57, 61; J. Lattanzio Depo, p. 180, Attachment 1, p. 15; Lewis Depo, pp. 36-37, 120, Attachment 4, pp. 5-6, 28; Lerner Depo, pp. 64, 69, Attachment 3, pp. 9, 12.)[3]

---

[3]   Plaintiffs' decision to seek accreditation from COMTA was Mr. Lattanzio's alone. (J. Lattanzio Depo, pp. 65, 69, Attachment 1, pp. 3, 5.)  Although Galen did not attain COMTA accreditation, rather than appeal COMTA's decision, as it apparently could have, Galen instead attempted to withdraw from the process and sued COMTA in federal court. (Aff. of P. Santoro, ¶ 49, Ex. Z, Attachment 12, pp. 315-321; J. Lattanzio Depo, pp. 116-117, Attachment 1, pp. 10-11.)   Galen took the cost of the failed accreditation effort as a business expense. (J. Lattanzio Depo, pp. 75, 84, Attachment 1, pp. 7, 9.)  Plaintiffs claim that defendant Lerner

Clearly, if these defendants had harbored malicious intent towards the plaintiffs, Galen's probation and short term reauthorization would not have been replaced with full reauthorization once the identified problems had been resolved. (Zdanys Depo, p. 290, Attachment 6, p. 69; Lewis Depo, p. 61, Attachment 4, p. 16.)[4]

Notably, other professionals, not affiliated with DHE, who participated in the evaluation processes have attested to the objectivity and professionalism of the DHE personnel involved. (Aff. of V. Voner, ¶ 18, Attachment 14, p. 2; Aff. of S. Cooper, ¶¶ 10, 12, Attachment 8, p. 2.) Ms. Cooper's participation had in fact been requested by the plaintiffs. (Aff. of P. Santoro, ¶ 9, Ex. C., Attachment 12, p. 15; Aff. of S. Cooper, ¶ 6, Attachment 8, p.1.)

---

somehow biased COMTA against Galen, but plaintiffs concede they have no evidence of this, and Ms. Lerner testified that at the site visit COMTA personnel pursued their own issues and duties, and she did not know what they were. Ms. Lerner only served as an observer and potential resource for the COMTA evaluators. (J. Lattanzio Depo, pp. 131, 138, 254, Attachment 1, pp. 12, 13, 18; Lerner Depo, p. 67, Attachment 3, p. 11; Aff. of B. Lerner, ¶¶ 24, 26, Attachment 9, pp. 3, 4.) Ms. Lattanzio has indicated she has no knowledge that Ms. Lerner either improperly withheld information from COMTA, or interfered with plaintiffs' purported contractual relations with COMTA. (*Plaintiff Sandra Lattanzio Answer to Defendants' First Set of Interrogatories And Request For Production*, 4/25/03, pp. 6, 7, Attachment 16, pp. 3, 4) Ms. Lerner has indicated that during site visits, her practice was to utilize a preexisting checklist. (Aff. of B. Lerner, ¶ 12, 19, 23, Ex. D, H, I, Attachment 9, pp. 19-28, 43-53, 54-63; *Defendant Lerner's Amended Response To Plaintiff Lattanzio's Request To Admit*, 11/18/04, Attachment 17, pp. 1-4.)

[4]    Plaintiffs also assert the dubious claim that the Commissioner and/or DHE were motivated by ill will towards Galen because Mr. Lattanzio had dismissed one Carole Woodbury, who was an acquaintance of Commissioner Lewis' daughter.  However, Commissioner Lewis testified she only met Ms. Woodbury twice, and although she thought she may have been informed that Ms. Woodbury had lost a job, she never knew who the employer involved was.  (Lewis Depo, pp. 90, 96, 99, Attachment 4, pp. 23, 24, 25.) Program officer Lerner testified that neither Commissioner Lewis nor her fellow program officer Patricia Santoro ever mentioned Woodbury to her. (Lerner Depo, p. 81, Attachment 3, p. 14.)    Woodbury herself, who plaintiffs cross-examined at the deposition, testified she never asked Commissioner Lewis to do anything on her behalf, and she never spoke with Lewis after her time at Galen ended. (Woodbury Depo, pp. 92, 95, Attachment 5, pp. 3, 5.)

    **B.**    **Plaintiffs' Substantive Due Process Claims (Counts 4, 5 and 6) Fail Because No Reasonable Fact Finder Could Conclude That Defendants' Actions "Shock The Conscience," And Federal Substantive Due Process Claims Cannot Substitute For Basic State Tort Law Claims**

Alleged abuses of the police power are only "sufficiently arbitrary to rise to constitutional magnitude when the conduct at issue shocks the conscience." County of Sacramento v. Lewis 523 U.S. 846-847, 118 S.Ct 1708, 1717, 140 L.Ed.2d 1043 (1998); Collins v. City of Harker Heights, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); Medeiros et al v. O'Connell, et al, 150 F.3d 164, 169-170 (2d Cir. 1998). Moreover, "[b]ecause the Due Process Clause 'does not purport to supplant traditional tort law in laying down traditional rules of conduct to regulate liability for injuries that attend living together in society,' the courts "reject[] claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law . . . ." Collins, 503 U.S. at 128, *citing* Daniels v. Williams, 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); Baker v. McCollan, 443 U.S. 137, 146, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). *See also*, McClary et al v. O'Hare et al, 786 F.2d 83, 87 (2d Cir. 1986). (The thrust of Parratt v. Taylor, 451 U.S 527, 543, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) "is to avoid 'turning every alleged injury which may have been inflicted by a state official acting under "color of law" into a violation of the Fourteenth Amendment cognizable under § 1983 . . . .'")

As noted above, the record is simply devoid of any evidence that establishes improper motive, let alone behavior that "shocks the conscience." Indeed, if the changes DHE sought from Galen were outrageous or conscience-shocking, why was Galen willing and able to resolve the conditions in relatively short order and obtain full standard reauthorization without

probation? (*See,* Lewis Depo, pp. 189, 271, Attachment 4, pp. 31, 44; Aff. of P. Santoro, ¶ 43, Ex. F, L, Attachment 12, pp. 29-31, 72-73; Aff. of J. Zdanys, ¶¶ 25-28, Attachment 15, p. 4.)

Between 1999 and May 18, 2002, DHE received eight (8) written complaints regarding Galen.  Of those eight (8) complaints, DHE found that Galen had either violated section(s) of the Connecticut General Statutes or a section(s) of the Regulations of Connecticut State Agencies in four (4) complaints, had not violated the statutes or regulations in three (3) complaints and one complaint was resolved by the parties. (Aff. of V. Lewis, ¶ 19, Ex. L, Attachment 10, pp. 172-262.)   As described by Dr. Zdanys, DHE felt it had the responsibility to inform Galen that it had received oral and written complaints about the school so the school could respond and address the concerns.  (Zdanys Depo, pp. 126-127, Attachment 6, pp. 27-28; Aff. of P. Santoro, ¶¶ 38, 39, 40, 41, 42, Ex. S, T, U, V, W, Attachment 12, pp. 137-140, 141-170, 171-208, 209-248, 249-301.)    DHE had no desire to shut Galen down or unduly or limit its operation. (Zdanys Depo, p. 290, Attachment 6, p. 69.)   And despite plaintiffs' voluminous allegations, even Mr. Lattanzio had to concede that he never heard Ms. Lerner make a misrepresentation, nor did he see her misrepresent anything in writing. (J. Lattanzio Depo, p. 131, Attachment 1, p. 12; Aff. of B. Lerner, ¶ 30, Attachment 9, p. 4; Aff. of P. Santoro, ¶ 52, Attachment 12, p. 7. )

In short, while a lawful regulatory process may on occasion cause hardship on the regulated, adherence to the regulatory process cannot constitute behavior that "shocks the conscience" within the meaning of substantive due process.

C.    **Plaintiffs' Conspiracy Claim Under 42 U.S.C. § 1985 (Count 10) Fails Because Plaintiffs Can Establish Neither A Conspiracy Nor  Race, National Origin, Sex Or Other Class-Based Invidious Discriminatory Animus**

In order to establish a conspiracy claim within the meaning of 42 U.S.C. § 1985, a plaintiff must demonstrate: (1) a conspiracy between defendants; (2) the intent to deprive the

plaintiff of the equal protection of the laws or the equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) a deprivation of his rights.[5]  In addition, to establish the second element set forth above, the plaintiff must show some rational or other class-based invidiously discriminatory animus based on discrete and immutable characteristics such as race, national origin or sex.  Martin v. New York State Dept of Correctional Services, et al, 115 F.Supp.2d 307 (N.D.N.Y. 2000).  *See*, *e.g.* Bailiff v. Adams County Conference Board, 54 F.Supp.2d 923 (S.D. Iowa 1999) (county assessors not a suspect class);  Steinert v. Winn Group, Inc., 83 F.Supp.2d 1234 (D. Kansas 2000) (class of employees not a suspect class); Santanta v. Calderone, 188 F.Supp.2d 160 (D.P.R. 2002) (members of a political party not suspect class);   Borlawsky v. Town of Windam, 115 F.Supp.2d 27 (D. Maine 2000) (single mothers not suspect class).

In addition, plaintiffs asserting such cause of action must allege and prove facts that indicate the existence of an agreement between some or all of the defendants to deprive the plaintiffs of their constitutional rights, and facts showing conspirators engaged in overt acts in furtherance of the agreement.  M.O.C.H.A.  Society, Inc. v. City of Buffalo, 199 F.Supp.2d 40, (W.D.N.Y. 2002)  Moreover, the general rule is that a corporate or organization is incapable of conspiring with its own employees as is necessary to state a claim under § 1985.  Hayes v. Allstate Ins Co, 95 F.Supp.2d 832 (W.D. TN 2000); *see also*, Ibarra v. Houston Independent School District, 84 F.Supp.2d 825 (S.D. TX 1999), *citing* Hillard v. Fergouson, 30 F.3d 649, 652-653 (5th Cir. 1994) (school board and its employees constitute single legal entity incapable

---

[5]    In the Amended Complaint, plaintiffs cite to 42 U.S.C. § 1985(c). The correct citation is 42 U.S.C. § 1985(3).

of conspiring with itself under 42 U.S.C. § 1985 (3)); *accord*, <u>McEnvoy v. Spencer</u>, 49 F.Supp.2d 224 (S.D.N.Y. 1999). Finally, the allegations and proof of conspiracy cannot be general or vague. <u>Washington v Niagra Mohawk Power Corp.</u>, 103 F.Supp.2d 517 (N.D.N.Y. 2000).

As set forth above, given the facts, no reasonable fact finder could conclude that the defendants actions were the result of any improper motive, let alone a race, sex, national origin or other class-based discriminatory animus as is required by 42 U.S.C. §1985(3). Operators of private occupational schools or massage therapy schools are hardly suspect class members who share discrete and immutable characteristics.

Nor can plaintiffs point to a shred of evidence that any of the defendants entered into an agreement or conspiracy to deprive the plaintiffs of their rights, or that they engaged in any overt act in furtherance of such an agreement. Each defendant simply played his or her role in carrying out his or her regulatory responsibilities, and in doing so acted within the scope of those duties. (Aff. of V. Lewis, ¶ 4, Attachment 10, p. 1; Aff. of J. Zdanys, ¶ 3, Attachment 15, p. 1; Aff. of P. Santoro, ¶¶ 6, 7, Attachment 12, p. 1; Aff. of B. Lerner, ¶¶ 4, 5, 7, Attachment 9, p. 1.)

**D. Plaintiffs' Federal Law Causes Of Action Similarly Fail Because Defendants Are Entitled To Qualified Immunity**

It is well settled that qualified immunity shields government officials performing discretionary functions from being held liable for civil damages arising from their actions which do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 813, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); <u>P.C. v. McLaughlin et al</u>, 913 F.2d 1033, 1038 (2d Cir. 1990). "The Supreme Court has expressly encouraged the use of summary judgment in cases of qualified immunity in order to

quickly extricate government officials from the burdens of defending against insubstantial suits."
*Id*.; Harlow, 457 U.S. at 815-816; Butz v. Economou, 438 U.S. 478, 507-508, 98 S.Ct. 2894, 57
L.Ed.2d 218 (1978); Cuoco v. Moritsugu, 222 F.3d 99, 115 (2d Cir. 2000).

Again, in carrying out their respective duties as official and employees of DHE, each
defendant interacted with the plaintiffs both legally and professionally, to the best of their
abilities. Even in the unlikely event that this Court were to find that one of them had somehow
violated the law, clearly the defendants were of the objectively reasonable belief that they were
acting lawfully in carrying out their respective regulatory functions, and thus are entitled to
qualified immunity. (Aff. of P. Santoro, ¶ 5, Attachment 12, p. 1; Aff. of B. Lerner, ¶ 4,
Attachment 9, p. 1.)

> **E.** **Plaintiffs' State Law Causes Of Action (Counts 7, 8, 9, 11, 12,**
> **13, 14, 15, 16, 17, 18, 19 & 20) Fail Because Plaintiffs' Federal**
> **Law Causes Of Action Fail, As Set Forth Above, And This**
> **Court Hence Cannot Exercise Pendent Jurisdiction Over The**
> **State Law Claims**

United Mine Worker v. Gibbs, 383 U.S. 715, 726-729, 86 S.Ct. 1130, 16 L.Ed.2d 218
(1966) and its progeny establish that a federal court may exercise pendent jurisdiction over state
law claims only when (1) there is a claim arising under the Constitution, laws or treaties of the
United States, (2) the relationship between that claim and any state law claims permits the
conclusion that the entire action before the court comprises but one constitutional "case," (3) the
federal claim or claims have sufficient substance to confer subject matter on the court, and (4)
the state and federal claims derive from a common nucleus of operative fact. When all such
conditions are not met, the federal courts refuse to entertain state law claims. *See*, Garro v.
Department of Education, 23 F.3d 734 (2d Cir. 1994) (trial court properly refused jurisdiction
over state law claim where all but an insubstantial federal claim had been dismissed); Block v.

16

First Blood Associates, 988 F.2d 344 (2d Cir. 1993) (state law claims properly dismissed where federal securities law claims dismissed); *accord*, Ahmed v. Trupin, 781 F.Supp. 1017 (S.D.N.Y.1992); Cohen v. Prudential-Bache Securities, Inc., 777 F.Supp. 276 (S.D.N.Y. 1991); Wiener v. Napoli, 760 F.Supp 278 (E.D.N.Y. 1991) (state law claims dismissed when federal RICO claim dismissed); Cuban v. Kapoor Bros., Inc., 653 F.Supp. 1025 (E.D.N.Y. 1986); *see also*, Spencer v. Banco Real, S.A., 623 F.Supp 1008 (S.D.N.Y. 1985) (lack of common nucleus of operative fact). This rule of law helps ensure that needless decisions of state law are avoided as a matter of comity and to procure a surer-footed reading of applicable state law. Rovira v. AT & T, 760 F.Supp 376 (S.D.N.Y. 1991).

As discussed above, defendants are entitled to summary judgment on all of plaintiffs federal claims. Therefore, this Court lacks pendent jurisdiction over the plaintiffs' state law claims, and they should be dismissed.

**F.    Plaintiffs' State Law Causes Of Action (Counts 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19 & 20) Fail Because The Defendants Are State Officials And/Or Employees Who Are Cloaked With Sovereign Immunity, And The Connecticut Claims Commissioner Has Explicitly Ruled Under State Law That Plaintiffs Are Not Entitled To A Waiver Of Sovereign Immunity In Order To Press Such State Law Claims**

The Connecticut Supreme Court has long held that the common law doctrine of sovereign immunity bars suit against the State except where the State, by appropriate legislation, consents to be sued. Canning v. Lensink, 221 Conn. 346, 349 (1992); Horton v. Meskill, 172 Conn. 615, 623 (1977); State v. Kilburn, 81 Conn. 9, 11 (1908). The rationale supporting this doctrine has evolved over time. The historical rationale, that the king could do no wrong, has been replaced with the more practical and democratic notion that subjecting state and federal governments to endless suits would interfere with the orderly conduct of the government's

business. <u>Martinez v. Department of Public Safety</u>, 263 Conn. 74, 78 (2003).  "[T]he subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds and property."  <u>Shay v. Rossi</u>, 253 Conn. 134, 165-66 (2000), *overruled on other grounds by* <u>Miller v. Egan</u>, 265 Conn. 301 (2003); *see also,* <u>Textron v. Wood</u>, 167 Conn. 334, 340 (1974), *citing* <u>Fitts v. McGhee</u>, 172 U.S. 516, 19 S.Ct. 269, 43 L.Ed. 535 (1899) ("public service might be hindered . . . and the public safety endangered, if the supreme authority of the state could be subjected to suit at the instance of every citizen, and thereby controlled in the use and disposition of the means required for the proper administration of government").

Although "[i]n its pristine form the doctrine of sovereign immunity would exempt the state from suit entirely," <u>Doe v. Heintz</u>, 204 Conn. 17, 31 (1987), the Connecticut Supreme Court has recognized very limited contexts in which the doctrine does not apply.  These are (1) when "the state, by appropriate legislation, consents to be sued," <u>F.D.I.C. v Peabody, N.E., Inc.</u>, 239 Conn. 93, 101 (1966);  and (2) when an action seeks declaratory or injunctive relief based on a substantial claim that the state or one of its officers has acted in excess of statutory authority or pursuant to an unconstitutional statute. <u>Doe</u>, 204 Conn. 17 at 31, <u>Horton</u>, 172 Conn. 615 at 624; <u>Barde v. Board of Trustees</u>, 207 Conn. 59, 64 (1988), <u>Miller</u>, 265 Conn. 301 at 325; <u>Prigge v. Ragaglia</u>, 265 Conn. 338, 349 (2003).   Neither of these exceptions applies to plaintiffs' state common law tort claims plead in counts 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19 & 20.  State law provides that a plaintiff seeking to bring such state law tort claims against the State employees or officials must first seek permission to sue such State officials from the State's Claims Commissioner. *See*, Conn. Gen. Stat. §§ 4-146 *et seq*.  Here, not only have the plaintiffs failed to obtain such permission, the Claims Commissioner has explicitly turned away their claims as

untimely within the meaning of Conn. Gen. Stat. § 4-148, as set forth in three separate ruling

dated December 26, 2003, a copy of which is attached hereto as Attachment 18, pp. 1-3, 4, 5. [6]

> **G.   Plaintiffs' Claims For Tortious Interference With Contractual Relations And/Or Business Expectancy (Counts 7 & 8) Fail Because Plaintiffs Can Establish Neither Malice Nor Intentional Interference Without Justification**

> "In order to recover for a claim of tortious interference with business expectancies, the claimant must plead and prove that:  (1) a business relationship existed between the plaintiff and another party;   (2) the defendant intentionally interfered with the business relationship while knowing of the relationship;  and (3) as a result of the interference, the plaintiff suffered actual loss."

Downes-Patterson Corp. v. First National Supermarkets, 64 Conn. App. 417, 428-429 (2001),

quoting  Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 32-33 (2000).

Furthermore,

> [a]lthough Connecticut courts "long [have] recognized a cause of action for tortious interference with contract rights or other business relations . . . [the case law indicates, nonetheless,] that not every act that disturbs a contract or business expectancy is actionable. . . . For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious.  This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . [An] action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means. . . . The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification. . . . In other words, the [plaintiff] bears the burden of alleging and proving lack of justification on the part of the [defendant]." (Citations omitted; internal quotation marks omitted.)  Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 805-806, . . .  (1999).

> "Stated simply, to substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted

---

[6]   Pursuant to Rule 201 of the Federal Rules of Evidence, this Court can take judicial notice of the Claims Commissioner's ruling, or, if the Court requires, the defendants can supply a certified copy of the ruling pursuant to Rules 803(8) and/or 902(1) of the Federal Rules of Evidence.

> from the defendant's commission of a tort.  [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. . . . [Not e]very act of interference is . . . tortious."  (Internal quotation marks omitted.) Golembeski v. Metichewan Grange No. 190, 20 Conn.App. 699, 703-704 . . . cert. denied, 214 Conn. 809 . . . (1990), quoting Blake v. Levy, 191 Conn. 257, 261 . . . (1983).

Downes-Patterson, 64 Conn. App. at 429; *accord*, Biro v. Hirsch, 62 Conn. App. 11, 21-22

(2001); Suffield Development Associates Ltd. Partnership v. National Loan Investors, L.P., 64

Conn. App. 192, 204-205 (2001); Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 805-806

(1999).

    Stated succinctly, carrying out one's lawful duties as a government regulator pursuant to

state statutes and regulations is not tortious conduct. Nor is it intentional interference without

justification under state law.   Indeed, concomitant state law created the regulatory process itself.

(Aff. of P. Santoro, ¶ 5, Ex. Z, Attachment 12, p. 9; Aff. of T. Tynan, ¶¶ 13, 14, 15, 16,

Attachment 13, pp. 9-10.)

    As noted above, there is simply no evidence of fraud, misrepresentation, intimidation or

molestation by these defendants. When certain problems or deficiencies were discovered at

Galen, the evidence establishes that the plaintiffs were fully informed of the issues and they were

quite promptly corrected, and Galen's authorization to operate without probation was renewed.

In the interim, rather than interfere, molest or intimidate, quite to the contrary, defendants

allowed both uninterrupted operation of the school and sufficient time for Galen to correct the

problems.  The school was never penalized or fined, nor were revocation proceedings initiated.

(Zdanys Depo, pp. 289-291, Attachment 6, pp. 68-70; Lewis Depo, pp. 192-193, Attachment 4,

pp. 33-34.)   Indeed, Ms. Lerner testified that she could not recall any situation where a school

that had been placed on probation suffered any real impact. (Lerner Depo, p. 137, Attachment 3, p. 23.)

Even if plaintiffs perceive that having to meet the regulatory requirements constituted a form of interference, it cannot by law be deemed either unjustified or tortious interference as is required under controlling state law.

> **H.    Plaintiffs' Claim of Common Law Civil Conspiracy (Count 9) Fails Because Plaintiffs Cannot Establish A Combination Of Two Or More Persons To Do A Criminal Or Unlawful Act By Criminal Or Unlawful Means, And An Act In Furtherance Of Such An Object**

> The elements of a civil action for conspiracy are: "(1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff."  (Internal quotation marks omitted.)  Marshak v. Marshak, 226 Conn. 652, 665 . . . (1993), overruled on other grounds, State v. Vakilzaden, 251 Conn. 656, 666 . . . (1999).

Biro, 62 Conn. App. at 16; Macomber v. Travelers Property & Casualty Corp., 261 Conn. 620, 647 (2002).

As discussed in subsection C above, there is simply no evidence that any of the defendants entered into a combination, agreement or conspiracy, let alone to commit a criminal or unlawful act.  Nor can plaintiffs point to any act in furtherance of any such a conspiracy. Either of these failures of evidence requires that this claim also fails as a matter of law.

> **I.    Plaintiffs' Claims For Defamation (Counts 11 & 12) Fail Because Plaintiffs Cannot Establish The Elements Of A Viable Cause Of Action For Defamation, And Defendants' Actions Were Cloaked In Absolute Immunity Or Privilege In Any Event**

> To establish a prima facie case of defamation, the plaintiff must demonstrate that:  (1) the defendant published a defamatory statement;  (2)

the defamatory statement identified the plaintiff to a third person;  (3) the
defamatory statement was published to a third person;  and (4) the
plaintiff's reputation suffered injury as a result of the statement.  See QSP,
Inc. v. Aetna Casualty & Surety Co., [256 Conn. 343] at 356;
3 Restatement (Second), Torts §§ 558, 580B, pp. 155, 221-22;  W. Prosser
& W. Keeton, Torts (5th Ed.1984) § 113, p. 802.

Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 217 (2004).  Truth, of course, is a complete

defense to defamation, and the Connecticut "Supreme Court [has] held that 'where the main

charge, or gist of the libel is true,' minor errors that do not change the reader's [or hearer's]

perception of the statement do not make the statement actionable." Lizotte v. Welker, 45 Conn.

Supp. 217, 224 (1996), *aff'd*, 244 Conn. 156 (1998), *citing* Goodrich v. Waterbury

Republican-American, 188 Conn. 107, 113 (1982).

In addition, in order to establish that these public employees and officials defamed them,

plaintiffs must prove that the defendants' statements were not protected by privilege.  Such a

privilege of absolute immunity "extends . . . to the proceedings of many administrative officers,

such as boards and commissions, so far as they have powers of discretion in applying the law to

the facts which are regarded as judicial or 'quasijudicial', in character."  Petyan v. Ellis, 200

Conn. 243, 246-247 (1986) (Internal quotation marks omitted.);  W. Prosser & W. Keeton, Torts

(5th Ed. 1984) § 114, pp. 818-19; Kelley v. Bonney, 221 Conn. 549, 566-567 (1992).  In Petyan,

the Connecticut Supreme Court determined that the Employment Security Division acted as a

quasijudicial body, and that the defendant's statements were protected by an absolute privilege.

The Petyan Court noted that the State's Employment Security Division had the power to

determine facts and to apply the appropriate law to those facts.  Petyan, 200 Conn. at 248-49.  In

Kelley, the Court further observed with approval that:

Other jurisdictions have also outlined a number of factors that assist in
determining whether a proceeding is quasijudicial in nature.  Among them
are whether the body has the power to:  (1) exercise judgment and

> discretion;  (2) hear and determine or to ascertain facts and decide;  (3)
> make binding orders and judgments;  (4) affect the personal or property
> rights of private persons;  (5) examine witnesses and hear the litigation of
> the issues on a hearing;  and (6) enforce decisions or impose penalties.
> Thomas v. Petrulis, 125 Ill.App.3d 415, 419-20, 465 N.E.2d 1059 (1984).
> Further, it is important to consider whether there is a sound public policy
> reason for permitting the complete freedom of expression that a grant of
> absolute immunity provides.  W. Prosser & W. Keeton, [Torts (5th Ed.
> 1984)], § 114, p. 816.

Kelley, 221 Conn. at 567. Based on this standard, as the Petyan Court before it had held with

regard to the State's Employment Security Division, the Kelley Court concluded that the

Connecticut State Board of Education was protected by the absolute privilege in that:

> [T]he state board of education possessed significant regulatory authority to
> conduct proceedings of a quasijudicial nature.  The detailed procedures,
> which ensure the reliability of teacher decertification proceedings, and the
> compelling public policy concern for the protection of school age children
> persuade us that the decertification proceedings before the state board of
> education were quasijudicial in nature, and that any statements made as a
> requisite step in those proceedings were absolutely privileged.  See Brody
> v. Montalbano, 87 Cal.App.3d 725, 151 Cal.Rptr. 206 (1978), cert. denied,
> 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979);  Weissman v. Mogol,
> 118 Misc.2d 911, 462 N.Y.S.2d 383 (1983).

Kelley, 221 Conn. at 571.  The Court in Craig v. Stafford Construction, Inc., 78 Conn. App. 549,

554 (2003), aff'd, 271 Conn. 78 (2004), further articulated the absolute privilege extending to

such proceedings, ruling that:

> . . . The principal factors to be considered are whether the body has the
> power to:  (1) exercise judgment and discretion;  (2) hear and determine or
> to ascertain facts and decide;  (3) make binding orders and judgments;  (4)
> affect the personal or property rights of private persons;  (5) examine
> witnesses and hear the litigation of the issues on a hearing;  and (6)
> enforce decisions or impose penalties. . . .  Further, quasi-judicial is
> defined as the action, discretion, etc., of public administrative officers or
> bodies, who are required to investigate facts, or ascertain the existence of
> facts, hold hearings, weigh evidence, and draw conclusions from them, as
> a basis for their official action, and to exercise discretion of a judicial
> nature." (Internal quotation marks omitted.)  Preston v. O'Rourke, . . . 74
> Conn. App. [301] at 309-10 . . . [(2002)];  see also Kelley v. Bonney, …
> 221 Conn. [549] at 567 . . . . [1992].

Plaintiffs' defamation claims stem from a May 18, 2001 DHE communication to Galen which stated the reasons why DHE was renewing Galen's authorization for a limited period with probation. Following the reasons given for the authorization, DHE expressed concern regarding informal complaints which the Department had received. DHE felt responsible to share those complaints with Galen. (Aff. of J. Zdanys, ¶¶ 11, 12, Ex. B, Attachment 15, pp. 16-18; Aff. of P. Santoro, ¶ 41, Ex. V, Attachment 12, pp. 209-248.) As noted above, however, a statement that is truthful is not defamatory, and without publication to a third party, no defamation has occurred.

The communication at issue noted that DHE had received oral and written complaints about Galen, including complaints to the effect that plaintiffs had threatened and intimidated students. The statement was truthful -- DHE had received such complaints. (Zdanys Depo, pp. 47, 89, 92, 123-148, Attachment 6, pp. 9, 18, 20, 24-49; Lewis Depo, pp. 99, 101, 103, 190, 205, Attachment 4, pp. 25-27, 32, 35; Lerner Depo, pp. 132, 134, Attachment 3, pp. 20, 22.) Even Mr. Lattanzio admitted there were many complaints. (J. Lattanzio Depo, p. 203, Attachment 1, p. 16.) For this reason above, these claims fail.

Plaintiffs apparently assert publication occurred when the DHE communication was sent to Donna Pitts, Galen's director. (Lewis Depo, pp. 210-211, Attachment 4, p. 37-38; Zdanys Depo, p. 44, Attachment 6, p. 6; Lerner Depo, p. 124, Attachment 3, p. 18.) However, as an officer or employee of the plaintiff Galen Institute, LLC, this could not constitute a publication to a third party. Such letters always go to the schools' directors as would be expected under the regulatory framework. (Lewis Depo, p. 211, Attachment 4, p. 38.) To the extent plaintiffs assert the posting of the letter by the school was publication, this claim also fails because it was done by the plaintiffs, and state law requires the posting of such probationary letters, and hence such

an act could not constitute unlawful or tortious conduct in any event. (Lewis Depo, pp. 239-240, Attachment 4, pp. 39, 40.) [7]

Finally, as alluded to above, the communication was protected by absolute privilege, insofar as it was part and parcel of an administrative proceeding involving an administrative officer, board or commission with the discretionary power to investigate, determine facts and apply appropriate law to those facts, like the Employment Security Division the Court in Petyan, 200 Conn. at 243, found cloaked in absolute privilege, and State Board of Education the Court in Kelley, 221 Conn. at 549, similarly held protected by absolute privilege.

Several witnesses described the regulatory process applicable to Galen and all unaccredited private occupational schools. DHE oversight of these schools falls under the Academic Affairs Division overseen by Dr. Zdanys, and all private occupational schools must be authorized to conduct business in the state. (Lewis Depo, pp. 28, 31, Attachment 4, pp. 1, 2; Lerner Depo, p. 42, Attachment 3, p. 6.)  In the regulatory process peer review is the norm, and so DHE staff with expertise in the area as well as others from the private occupational school industry conduct the visits and reviews. (Lewis Depo, p. 33, Attachment 4, p. 3.)  DHE staff are empowered to make unannounced visits. (Lewis Depo, p. 40, Attachment 4, pp. 8-9.) Correspondence often goes back and forth to address issues that arise and the process can be a cooperative effort as well as a regulatory one. (Lewis Depo, p. 45, Attachment 4, p. 9; Zdanys Depo, pp. 45-47, Attachment 6, pp. 7-9.)

---

[7]    Plaintiffs also assert that the DHE reports or correspondence critical of Galen become public records, and thus are available to third parties. However, no Freedom of Information requests have been made for such materials, and even if they had been, complying with a lawful FOIA request for a public document obviously cannot constitute the element of publication for purposes of a state law defamation claim. (Lewis Depo, pp. 205, 207, Attachment 4, pp. 35, 36.) After all, in such an instance concomitant state law, not tortious conduct, would have caused the release of the information.

In terms of process, the application for authorization or reauthorization goes first to one of the two DHE program officers. (Aff. of P. Santoro, ¶ 5, Ex. A, Attachment 12, p. 9; Aff. of B. Lerner, ¶ 4, Ex. A, Attachment 9, pp. 6-9.) The program officer or the team review the school's operation and an evaluation team will visit, review records, including financial records, investigate and generate findings and recommendations that go to Dr. Zdanys and the school. (*Id.*) Dr. Zdanys in turn makes a recommendation to the Commissioner on authorization or reauthorization and whether probation or even stronger steps are warranted. (Zdanys Depo, pp. 14, 15, 18, 53, 84, 152, Attachment 6, pp. 3, 4, 5, 11, 17, 50; Lewis Depo, pp. 49, 59, Attachment 4, pp. 12, 15; Lerner Depo, pp. 33, 35, 37-38, 57, Attachment 3, pp. 2, 3, 4-5, 7.) The evaluation team's report may make suggestions or recommendations on ways the school can improve and better serve students and/or come into full compliance. (Zdanys Depo, pp. 45, 51, Attachment 6, pp. 7, 10.) Just as Galen has, schools are given the opportunity to respond to the evaluation report. (Lewis Depo, pp. 51, 160, Attachment 4, pp. 14, 30; Aff. of P. Santoro, ¶ 13, 21, Ex. D, J, Attachment 9, pp. 16-20, 57-63.) There is a right to appeal the Commissioner's decision. Conn. Gen. Stat. § 10a-22. Again, as happened once with Galen, schools can be placed on probation to allow efforts to resolve problems that have been identified. (Lewis Depo, pp. 34, 39, 47-48, 50, Attachment 4, pp. 4, 7, 10-11, 13; Zdanys Depo, p. 259, Attachment 6, p. 64.)

Comparing the functions and powers of DHE in its regulation and oversight of the private occupational schools pursuant to Conn. Gen. Stat. §10a-22a *et seq*. and its corresponding regulations, in relation to the factors spelled out most recently by the Court in Craig, 78 Conn. App. at 549, 554, leaves little doubt that this communication was privileged, and cannot be the basis for a claim of defamation. Under its statutes and regulations, DHE can indeed exercise judgment and discretion, hear and determine facts and issues, issue binding orders affecting

private and public rights, examine witnesses and enforce decisions.   In short, DHE can and does

investigate, weigh evidence and draw conclusions.

      Plaintiffs' defamation claims thus also fail as a matter of law.

      **J.     Plaintiffs' Claim For Intentional Infliction Of Emotional Distress (Count 13) Fails Because Plaintiffs Cannot Establish That Defendants Harbored An Intent To Inflict Emotional Distress, That Defendants' Conduct Was Extreme And Outrageous, Or That Any Distress Purportedly Sustained Was Severe**

      A claim of intentional infliction of emotional distress requires a plaintiff to prove the following elements: "(1) that the actor intended to inflict emotional distress;  or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."  (Internal quotation marks omitted.)  <u>Campbell v. Plymouth</u>, 74 Conn.App. 67, 77 . . . (2002).

<u>DeCorso v. Watchtower Bible & Tract Society of New York, Inc.</u>, 78 Conn. App. 865, 872

(2003), *cert. denied*, 266 Conn. 931 (2003); *accord*, <u>Appleton v. Board of Education</u>, 254 Conn.

205, 210 (2000).  Moreover,

      [l]iability for intentional infliction of emotional distress requires conduct that exceeds "'all bounds usually tolerated by decent society. . . .'"  <u>Petyan v. Ellis</u>, . . . 200 Conn. at 254 n. 5, . . . , quoting W. Prosser & W. Keeton, Torts (5th Ed.1984) § 12, p. 60.  "Liability has been  found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965).  "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress."  <u>Mellaly v. Eastman Kodak Co.</u>, 42 Conn. Supp. 17, 19 . . . (1991).

Appleton, 254 Conn. at 210; *accord*, Alexandru v. West Hartford Obstetrics and Gynecology, 78 Conn. App. 521, 526-527 (2003).

Once again, as set forth above, plaintiffs cannot demonstrate any intent to inflict distress, and surely cannot establish that defendants conduct was extreme, outrageous or conscience-shocking. The record establishes that far from acting atrociously or indecently, defendants carried out their regulatory duties with as little disruption to the plaintiffs as the circumstances -- which required correction of certain deficiencies -- would permit. Defendants put Galen back on the track of normal reauthorization without probation as soon as adherence to the law and good judgment would allow. (Lewis Depo, pp. 61, 271, Attachment 4, pp. 16, 44; Zdanys Depo, pp. 259-260, 290-291, Attachment 6, pp. 64-65, 69-70.) [8] In fact, DHE wrote to Galen on two occasions requesting evidence of documentation that deficiencies were corrected and received inadequate responses. (Aff. of J. Zdanys, ¶¶ 14, 20, 21, 23, 24, Ex. D, F, H, J, Attachment 15, pp. 26, 48, 50-51, 53-54.)

> **K.    Plaintiffs' Claim for Negligent Infliction Of Emotional Distress (Count 14) Fails Because Plaintiffs Cannot Establish That Defendants' Conduct Created An Unreasonable Risk Of Causing The Plaintiffs Emotional Distress, That Any Such Purported Distress Was Foreseeable, Or That Such Purported Distress Was Severe**
>
> To establish a claim of negligent infliction of emotional distress, the plaintiff must prove the following elements: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." Carrol v. Allstate Ins. Co., 262 Conn. at 433, 444 . . . (2003).

---

[8]    Nor, notably, is there any evidence of severe distress. While Sandra Lattanzio complained of stress, she never sought any treatment, and confessed that when it comes to the "legal stuff" she really did not get involved. (S. Lattanzio Depo, pp. 32, 87, Attachment 2, pp. 4, 10.)

<u>DeCorso</u>, 78 Conn. App. at 874-875.

Rather than breach any duty they owed to the plaintiffs, the evidentiary record establishes defendants carried out their regulatory duties under the relevant statutes and regulations competently and with as little damage or interference to the plaintiffs as the law and good judgment permitted. (Zdanys Depo, pp. 289-291, Attachment 6, pp. 68-70; Lewis Depo, pp. 192-193, 271, Attachment 4, pp. 33-34, 44.)

**L.    Plaintiffs' Claims For Common Law Negligence And Negligence Per Se (Counts 15, 17 & 19) Fail Because Plaintiffs' Cannot Establish Defendants Violated Any Particular Duty Of Care They Owed The Plaintiffs**

The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . .  If a plaintiff cannot prove all of those elements, the cause of action fails."(Citation omitted; internal quotation marks omitted.)  <u>Roach v. Ivari International Centers, Inc.</u>, 77 Conn. App. 93, 99 . . .  (2003).

<u>Madsen v. Gates</u>, 85 Conn. App. 383, 392 (2004); <u>Murdock v. Croughwell</u>, 268 Conn. 559, 566 (2004). State officers and employees who are accused of negligence, are of course, as noted above, protected by sovereign immunity, which can only be overcome by demonstrating either a statute authorizing direct suit based on such allegations, or permission to sue the State as granted by the Claims Commissioner. *See, e.g.,* <u>Hunte v. Blumenthal</u>, 238 Conn. 146, 151 (1996). Plaintiffs can demonstrate neither.

In fact, on the issue of injury, based on the financial data provided by Galen to DHE, Galen's income has increased *every year* since 1997, when the school was initially authorized. (Aff. of S. Ciecko, ¶ 7, Ex. A, Attachment 7, pp. 3-4.) Moreover, Galen was permitted to continue to operate throughout its probation, and any decrease in potential enrollment income was more attributable to Galen's failure to attain accreditation than to the brief period of

probation. (Lewis Depo., pp. 61, 192-193, Attachment 4, pp. 16, 33-34; S. Lattanzio Depo., p. 66, Attachment 2, p. 8.)  This is largely because without federally recognized accreditation, Galen students do not qualify for federal student loans. (S. Lattanzio Depo., p. 52, Attachment 2, p. 7.) Galen nevertheless receives more applicants than they can enroll, at least at all campuses other than Stamford. (S. Lattanzio Depo., pp. 9, 14, Attachment 2, pp. 2, 3.)   Losses also result from students defaulting on payment plans after graduation. (S. Lattanzio Depo., p. 50, Attachment 2, p. 6.)  At her deposition, Ms. Lattanzio could not recall any damages that Galen had incurred. (S. Lattanzio Depo., p. 77, Attachment 2, p. 9.)

Moreover, as discussed above, in carrying out their discretionary investigatory and decision-making duties, no reasonable fact finder could conclude these defendants negligently caused injury to the plaintiffs.

> **M.    Plaintiffs' Claims For Gross Negligence (Counts 16, 18 & 20) Fail Because Plaintiffs Cannot Establish Defendants Grossly Violated Any Standard Of Care They Owed The Plaintiffs, And Connecticut Recognizes No Such Cause Of Action In Any Event**

"[G]ross negligence has never been recognized in this state as a separate basis of liability in the law of torts. . . . [Connecticut] ha[s] never recognized degrees of negligence as slight, ordinary, and gross in the law of torts." <u>Decker v. Roberts</u>, 125 Conn. 150, 157 . . . (1939);  see also <u>Film v. Downing & Perkins, Inc.</u>, 135 Conn. 524, 526 . . . (1949) ("[w]e do not recognize a classification of standards of care into slight, ordinary, and gross, or the like, except in certain definite relationships").

<u>Mathiessen v. Vanech</u>, 266 Conn. 822, 833, n. 10 (2003).  Given the foregoing, Counts 16, 18 & 20 state no cause of action under Connecticut law separate from the negligence alleged in Counts 15, 17 & 19, which themselves fail for the reasons set forth above.

III.    <u>Conclusion</u>

For all the foregoing reasons, and such other further reasons as may appear at argument on the matter, the defendants respectfully urge the Court grant them summary judgment on all of plaintiffs' claims.

<div style="margin-left:50%">

DEFENDANT

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:    /s/_____
       M.J. McCarthy
       Assistant Attorney General
       Federal Bar No. ct09031
       55 Elm Street, P.O. Box 120
       Hartford, CT  06141-0120
       Tel.:  (860) 808-5210
       Fac.:  (860) 808-5385
       Email:  mj.mccarthy@po.state.ct.us

</div>

<div style="text-align:center">

**CERTIFICATION**

</div>

I hereby certify that a copy of the foregoing ***Revised Memorandum in Support of Defendants' Motion for Summary Judgment*** was mailed, first class postage prepaid, this 19th day of May, 2005 to:

James Lattanzio
c/o Galen Institute
1025  Silas Deane Highway
Wethersfield, CT   06109

Thomas Amato, Esq.
357 East Center Street
Manchester, CT   06040

<div style="margin-left:50%">

__/s/_____
M.J. McCarthy
Assistant Attorney General
Federal Bar No. ct09031

</div>